UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

LESLIE BANKS,

                Plaintiff,

                                    Case Number 04-10258-BC
v.                                   Honorable David M. Lawson

DOW CHEMICAL COMPANY,

                Defendant.

_____/

## OPINION AND ORDER GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The defendant, the Dow Chemical Company, has filed a motion for summary judgment in this employment action brought by its former employee, Leslie Banks. Banks was employed by Dow at its Midland, Michigan facility from February 2002 until April 2004. She filed a three-count complaint in this Court alleging that she was terminated because of her religious beliefs in violation of Title VII, 42 U.S.C. 2000e *et seq.,* and Michigan's Elliot Larson Civil Rights Act, Mich. Comp. Laws. § 37.2101 *et seq.* She also alleges that the defendant violated the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.*, when it did not restore to her former position after she took a medical leave of absence and was retaliated against for taking leave. The defendant asserts that after having a full opportunity for discovery, the plaintiff cannot make out a case for religious discrimination either by direct or indirect evidence, and her FMLA claim must fail because the plaintiff has presented no evidence that the defendant knew she had taken to leave under that Act at the time the decision to discharge her was made. Rather, the defendant argues, the plaintiff was a poor performer and was discharged on that basis alone. The plaintiff has filed a response in opposition to the motion, and the Court heard oral argument on October 5, 2005. The Court finds that the plaintiff

has not presented sufficient evidence to warrant a trial on the question of whether her termination was a result of illegal discrimination under federal or state law, and there is no basis to conclude on this record that her leave-taking played a role in the decision to terminate her.  The Court, therefore, will grant the defendant's motion for summary judgment.

## I.

The plaintiff worked directly for Dow from February 2002 until her discharge on April 12, 2004.  The record suggests that she also was employed between 1998 and 2002 at Dow in a temporary capacity through Kelly Services, a temporary worker agency.  Banks was a senior communications assistant in the Oxides Derivatives Department, where she was responsible for coordinating several projects related to external business communications and attending to the logistics for trade shows, advertising, literature routing, and production.

Initially, the plaintiff performed well at her job.  On November 14, 2002, she was recognized for, among other things, her "outstanding work and planning support and coordination" in connection with Dow's booth at the 2002 International Coatings Exposition.  Pl.'s Resp.  Br.  Ex. E, Special Recognition Award.

By all accounts, the plaintiff was a devout Christian and openly practiced her faith.  Dow's director of human resources, Kathy McDonald, observed that the plaintiff had a spiritual screen saver installed on her computer, wore a cross necklace, and sported religious t-shirts on casual Fridays.

The plaintiff's display of her faith apparently caused tension with other employees at times. For instance, the plaintiff's religious beliefs became an issue when she complained to McDonald

about a coworker, Tara Mackowski, who used profanity when speaking to her husband on the telephone.  McDonald recalled:

> A.    . . . It was a general feeling because of the – Leslie was – is open about her Christianity.  And when she would reprimand or discuss what she viewed as inappropriate or poor treatment of – I remember specifically one situation where Leslie discussed with Tara Mackowski a phone call that she had overheard with – between Tara and her husband.  And Leslie was very uncomfortable that Tara was very direct and very – cussing at him.  Leslie actually described that same call because it made Leslie feel awkward and uncomfortable
>
> Q.    Who told you about the phone call?
>
> A.    Tara and Leslie both told me about the phone call.
>
> Q.    Leslie talked about the phone call because she was offended . . . .
>
> . . .
>
> Q.    What did Tara Mackowski say with regard to this conversation that related to Leslie's Christian beliefs?
>
> A.    She felt that Leslie was judging her – judging her by her Christian beliefs and that frankly it wasn't Leslie's business to tell Tara how to treat her husband.

Def.'s Mot. Summ. J., McDonald dep. at 32-34.

McDonald testified that she looked into the plaintiff's complaint about the use of profanity and informed the plaintiff that "an extraordinary exhibition of religious beliefs" could be viewed as offensive.  *Id.* at 45-46.  Nonetheless, McDonald could not "recall specific examples" of "anything that was offensive that Leslie did outwardly with regard to her Christian beliefs that would have or should have been viewed by the employees that somewhat somehow imposing her beliefs[.]" *Id.* at 48-49.  Ultimately, according to the plaintiff, McDonald told her to "tone it down" with respect to her religious beliefs and references.  Pl.'s Resp. Br. Ex. A, Banks dep. at 52.

In June 2003, the plaintiff continued her work as a communications assistant under the direct supervision of Jennifer Heronema.  As Heronema's assistant, Banks was responsible for "literature routings, budget tracking, literature fulfillment, maintaining Heronema's calendar, setting up meetings, making travel [arrangements], and dealing with trade shows." Def.'s Mot. Summ. J. Ex.

2, Banks dep. at 28, 30.  The plaintiff also saw to it that press kits were put together for media events

that Heronema organized and at times arranged for travel for individuals attending those events.

Heronema testified at her deposition that she was aware of the plaintiff's faith interest.

Irrespective of the plaintiff's religious manifestations, shortly after the plaintiff began

working for Heronema, the defendant claims it developed a concern over the plaintiff's ability to

perform her job duties. In her affidavit, Heronema stated, "a series of incidents occurred that caused

me to question whether Banks had the necessary skills and abilities to perform her duties as . . . my

assistant." Def.'s Mot. Summ. J. Ex. 5, Heronema aff. at ¶ 4.  The first such incident occurred on

June 13, 2003, Heronema recalled. On that date,

> Banks came into my office crying and asked that her work area be moved. She
> complained that several of her coworkers had refused to lower their voices while
> Banks was making a phone call. Although I was sympathetic to Banks' concern and
> I agreed that her coworkers needed to be more respectful of her requests, I was aware
> that Banks had often complained about her coworkers and the number of personal
> calls they made/received while at work. Thus, I was not surprised when Banks
> receive[d] the response she did from her coworkers, as unprofessional as that
> response might be.
>      Because I had receive[d] other complaints from Banks regarding the activities
> or attitudes of her coworkers, I became concerned that these reports were counter
> productive and were affecting Banks' ability to do her job.
>      I expressed this issue to Leslie and thought the issue was resolved.

*Id.* at ¶¶ 8-10.

The next incident occurred on June 19, 2002.  Banks asked Heronema if she could leave

early so that she could "mow her grass." *Id.* at ¶ 13. In her affidavit, Heronema recounted:

> I denied her request because I had recently allowed Banks to leave early for a doctors
> visit and because the atmosphere among the office professionals was still tense after
> the June 13 confrontation.
>      I assumed the issue was resolved because [Banks] responded to my email by
> saying: "No problem, I understand." Then several hours later, Banks sent me a very
> long email which based on the text of her email and the time she sent it to me, must

-4-

have taken her at least thirty minutes to draft. Banks' email detailed the various comings and goings of the people in her department.

I responded to Banks' email by expressing concern that Banks spent to [sic] much time focusing on what everyone else was doing, or not doing, as opposed to focusing on the assignment that I had given her.

*Id.* at ¶¶ 14-16.

Thereafter, the plaintiff missed work because of a number of doctor's appointments; she also complained of being tired. Heronema believed that the absences affected the plaintiff's ability to complete her own job effectively. Heronema met with Banks on August 26, 2003 to discuss those concerns, and Heronema's notes state that she "suggested that Banks meet with her doctor and determine if there was something [Dow] could do to help Banks, such as a shortened workday." *Id.* at ¶¶ 18-21. Around this time, Heronema also discovered that the plaintiff had difficulty completing even simple tasks. Heronema "received two . . . complaints from business colleagues who expressed concerns that Banks did not seem to [be] picking up on their direction or was not able to process what appeared to be simple requests." *Id.* at ¶ 25.

On September 4, 2003, the plaintiff wrote an email to Heronema, which stated: "Jen, it is 3:10 and I have to go home. I am so tired[.] I feel ill and I don't seem to be accomplishing much. I will see you in the morning." Def.'s Mot Summ. J. Ex. 4, Email (Sept. 4, 2003). The following day, Heronema again met with the plaintiff, suggested that she consult her physician, and gave her a set of instructions to follow. The instructions read:

1. Need a letter from your physician outlining any limitations you have regarding work hours. This will allow us to determine any short-term provisions we need to make. If the doctor says there are no limitations, then we need that in writing, too. Bring that letter directly to me.

2. Sign form authorizing your doctor to speak to our doctor. We will not be privy to the specifics, but it will allow us to make a determination, based on doctor recommendations, as to the best way to move forward. Your doctor should mail the

-5-

completed form to doctor Marcia Lee in the Health Services Department at the
address on the form.

3. These tasks need to be completed by Friday, September 12.

Def.'s Mot. Summ. J. Ex. 5, Instructions.

Unrelated to health issues, Heronema criticized the plaintiff for an email communication with
a Dow manager. The email, dated September 9, 2003, from the plaintiff to Roger Brayshaw, a
European marketing manager, was sent after Brayshaw stated he could not attend a meeting. It read:

> Roger,
> Your calendar does not indicate that you are out. This makes it difficult to schedule
> a meeting. Do you intend to update it soon?

Def.'s Mot. Summ. J. Ex. 6, Email (Sept. 9, 2003). Heronema found the "response to this manager
to be inappropriate and unprofessional." Heronema told Banks "that she should not be 'slapping the
hand of our marketing managers just because their calendars were not up to date.'" Heronema aff.
at ¶¶ 33, 34.

On September 10, 2003 the plaintiff took a leave of absence. The stated reason for the leave
was to help her mother care for her ill father. The plaintiff also testified that she took time
"because I had been looking tired and that maybe I needed some time off." Banks dep. at 25. Prior
to beginning her leave of absence, the plaintiff set up her email account to automatically respond
to incoming messages with the notification that she was out of the office. The notification also
concluded with the words "God Bless."

McDonald testified at her deposition that she received two employee complaints about the
plaintiff's use of "God Bless" in the out-of-office notification. McDonald recalled:

> Q.   Can you tell just specific to the issue regarding the religion or the religious
>       belief what you and Jennifer Heronema discussed?

-6-

    A.       I initiated that conversation because Leslie had an out of office indicator in her e-mail that had a spiritual connection. And I can't recall exactly what it was, but it was something like "God bless." And I had had two complaints that this was a violation of Dow's policy and inappropriate use of Dow's e-mail to have religious connotation

McDonald dep. at 56. Apparently, McDonald asked Heronema to remove "God Bless" from the out-

of-office notification, and Heronema complied.  Heronema testified:

    Q.       And what did you do when you learned of that?
    A.       I called Information Services to try to find out how to go in and change that to a "thank you" or "best regards" or something of that nature.
    Q.       And why did you do that?
    A.       Because I was asked by human resources to do that and was prompted by the complaint.
    Q.       Did you feel that it was inappropriate for Leslie to have "God bless" on her out of office e-mail?
    A.       Yes, but it's also I considered it a non-issue. If it had not been brought to my attention to change it, I would not have changed it.

Heronema dep. at 34-35.

After the message was removed, McDonald and Heronema had an additional discussion

about the plaintiff.  McDonald recalled the following at her deposition:

    Q.       Okay.  So what I want to know is . . . tell me what was said between you and Jennifer Heronema concerning that.
    A.       We had a discussion about the complaint that had been raised about the out of office indicator and the fact that hostile work environment takes on many shapes and many forms.  And that because we had – I had the previous conversation with Jennifer at the time that we were resolving the office professional work partner issues about those sensitivities and about the sensitivity to insure you're not imposing your own personal beliefs and judgments, that's becoming disruptive.  And because we had this, that we needed to be sure that those kinds of concerns had been raised and could constitute at some point a more formal complaint, which would result then in a formal investigation process.

McDonald dep. at 66-67.

-7-

While the plaintiff was on leave, Heronema discovered other performance issues. According to Heronema, the plaintiff had not sent brochures for an upcoming media event in New Orleans as instructed. In Heronema's words:

> On October 8, 2003, I received a call from Alissa Ross, a[n] . . . Event Planner, who was handling [Dow's] on-sight activities at the NPRA conference in New Orleans. Ross informed me that Banks had not sent the Dow Gas Treating overview brochures to the conference.
> I had asked Banks to send those brochures several weeks before . . . the event, which was prior to Banks beginning her medical leave. Banks had assured me that arrangements had been made for the literature to be delivered, along with the trade show booth in advance of the conference.
> Although I sent the brochures to the conference, they did not arrive until midway through the second day of the three-day conference.
> Banks' failure to sent those brochures was not acceptable.

Heronema aff. at ¶¶ 37-40.

Heronema also found that the plaintiff failed to arrange a bus for another event. Heronema recalled that "[p]rior to Banks beginning her medical leave, I had asked her to reserve a bus for the November 4 Media Day in Lake Jackson, Texas." *Id.* at ¶ 42. When checking into the status of the bus, Heronema was told that the plaintiff "had not ordered the bus as I directed and that the carrier no longer had a bus available for the day of the event." *Id.* at ¶ 43. The result was "a great amount of confusion and . . . additional out of pocket expense to the business." *Ibid.*

The plaintiff returned from her leave on October 28, 2003. Thereafter, Heronema attended the "Gas Treating Media Day," an event which Heronema described as important for the department. The plaintiff was responsible for assembling the press kits the night before, but admitted at her deposition that she did not properly do so. To fix the mistake, Heronema apparently was "up before dawn the next morning printing and re-collating the materials." Heronema aff. at ¶ 48. She even had to "recruit members of the business team" to update the kits on location "just minutes before the

-8-

event started." *Ibid.* The plaintiff also had managed to provide the incorrect map to the event's location in the materials.

To complicate matters further, Heronema was expecting materials from one of the event's presenters. The plaintiff received the presentation via email and forwarded it to Heronema. However, Heronema did not have email access at the event and the plaintiff did not inform the presenter that Heronema had no way to receive the materials. The plaintiff also did not tell Heronema that the presentation had been received. Heronema stated that "[a]ll of this was highly embarrassing" and subsequently recommended the plaintiff be placed in Dow's "managing poor performers" process. Heronema aff. at ¶¶ 55, 56-57.

On November 17, 2003, Heronema set up a meeting with the plaintiff ostensibly because the plaintiff "was not meeting the basic requirements of [her] position . . . ." *Id.* at ¶ 61. That meeting culminated in a lengthy letter, which summarized the meeting and set forth specific performance requirements. The letter contained a warning that "[r]eligious references in written (electronic) or oral communications could constitute a hostile work environment. You need to use good judgment in both written and verbal communications and, if you have questions, please discuss with me." Def.'s Mot. Summ. J. Ex. 9, Letter (Nov. 17, 2003). The letter prescribed a continuing performance review process and scheduled meetings on November 24 and December 12, 2003. Heronema concluded her letter as follows:

> I know you are capable of making this change and renewing your commitment to this role. Changing this trend is completely up to you. I believe that these performance issues can be overcome before disciplinary action is required, but immediate action needs to be taken. It is my hope that with your total awareness and focus, we can work together on solutions and actions that will address these performance issues. I welcome any additional suggestions you have and am committed to working with you to resolve these performance issues.

*Ibid.*

The plaintiff recalled at her deposition that after the meeting she understood Heronema to be "really very serious about her unhappiness with me" and that her "job was on the line." Banks dep. at 39.  In her deposition, Heronema discussed what she meant by the portion of the letter dealing with religion.  She stated:

> Q.    Okay.  You believed that the issue regarding religious references was important enough to put in the November 17 . . . notice . . .?
> A.    Only because she had had the discussion before and it was a – confirming what she'd already been told.
> . . .
> Q.    And you believed what she had been told was not to use religious references?
> A.    Yes.
> Q.    Did you feel it was inappropriate for Leslie Banks to use religious references in the workplace?
> A.    Yes.
> Q.    Okay.  Did you believe that using religious references in the workplace could create a hostile work environment?
> A.    Yes.
> Q.    . . . Why . . . ?
> A.    Because it could be very offensive to others that did not follow the same beliefs?

Heronema dep. at 37-38.

After reading the letter, the plaintiff requested a meeting with Heronema.  The meeting was scheduled, but before it occurred Heronema suggested to the plaintiff that she track her daily activities to identify ways to improve efficiency.  On November 21, 2003, the plaintiff emailed Heronema three times.  In the first email, the plaintiff stated: "In able [sic] to help me learn and grow from my mistakes, would you please send me a list of what things I should have done that wasn't done, and all the mistakes that I have made.  I would appreciate it very much." Def.'s Mot. Summ. J. Ex. 12 Email (Nov. 21, 2003, 7:53 a.m.).  Heronema responded that her performance letter and their previous conversations covered the plaintiff's request.  But she also promised to "address the

correction of these things in our goal setting session on Monday when we develop specific actions.

Please come in at 2:30 today, so we can get your questions answered." *Ibid.*

> In the second email, the plaintiff wrote:

> I know we discussed in words what I have done wrong (example you gave - didn't send brochures down to NPRA, Press Kit, shuttle bus, and whatever else that you have that you haven't told me), but I would really like you to put them in writing for me for my records. This would benefit me greatly and really would only take a few minutes of your time. I don't need you to give me expectations or anything else. Only what I asked for in the first sentence of this email.

> You have a full schedule today so we can wait and meet on Monday if you would like.

*Ibid.*  In her third email, the plaintiff expressed concern about tracking her time.  She stated, "I have started this process today, however you and I know this is going to slow my productivity down significantly.  With this being the case I am sure you will understand when I am unable to get my job done as quickly as I have in the past."  Def.'s Mot. Summ. J. Ex. 13, Email (Nov. 21. 2003, 1:38 p.m.).

> Heronema responded to the plaintiff's email as follows:

> As noted in the time sheet instructions, I'm only asking for a "brief description of the tasks you perform."  This will help me assess where your skill gaps are.  It's clear from this exercise that prioritization and time management are barriers.  Time tracking should take you only about 5 minutes per day.  I'd like to see you before you leave today.  Please come by my office at 4:30 p.m.

*Ibid.*

> The plaintiff met with Heronema as requested.  The meeting did not go well. The plaintiff recalled the meeting in these words at her deposition:

> A.   No, it was not a friendly meeting.
> Q.   It was not a friendly meeting?
> A.   No.

-11-

Q.      Okay. Can you tell me in your own words, how would you describe the tone
        of the meeting?
A.      It was very tense, she raised her voice and was yelling.  So loudly that my
        coworkers could hear her outside of the office.
. . .
Q.      Other than remembering that she was shouting at you, what else, if anything,
        do you remember about the meeting?
A.      I remember telling Jennifer that the way that she treated me was not
        acceptable to me, that it was not respectful, and the way she talked to me was
        not respectful, and I really wished that she could make a change in that area
        because it was embarrassing.
Q.      Do you recall anything else?
A.      Yes, she told me that – that I was – oh, what's the word – excuse me – that
        I could not do my job, that I was – oh, there's a term, I can't think of it, it just
        escaped me. Incompetent.
Q.      She used that actual word?
A.      Yes.
Q.      Okay. Okay. Anything else you recall that she said?
A.      That she could not separate our professional relationship and our personal
        relationship, that it was very hard on her.
Q.      Anything else?
A.      Let me think a minute. I can't remember at this point if I asked her to jazz out
        because she was unhappy with me.

Banks dep. at 55, 57.

The plaintiff further testified that she asked Heronema if she could transfer departments, but

that Heronema responded "that in all good consciousness [sic] she could not refer me to anybody."

*Id.* at 58. In addition, the plaintiff stated the Heronema told her that "making mistakes can't happen

anymore, because it's an embarrassment to this company[.]" *Id.* at 61.  Apparently, the plaintiff had

"made too many [mistakes] already." *Ibid.*

The plaintiff believed that Heronema acted disrespectfully during the meeting and at other

times: "When she would be unhappy with me, the tone of her voice, when she would say something

to me it was a punishment-type voice, a look down on me type of attitude and voice when we

discussed things. . . . If I did something that she didn't like she would not talk to me. She'd pass me

-12-

in the hallway and not look at me, not talk to me until I talked to her first." *Id.* at 60. Eventually, the meeting degenerated to Heronema's ranting at the plaintiff in a loud voice, an action that Heronema later regretted. Heronema explained in her affidavit that the two were "emotionally invested in the moment," and she decided to stop the meeting. Heronema aff. at ¶ 83. Heronema informed McDonald about the meeting and that she had raised her voice. *Ibid.*

On the following Monday, Heronema apologized to the plaintiff. However, according to the defendant, the relationship between the plaintiff and Heronema deteriorated further after the meeting. On December 2, 2003, the plaintiff emailed Heronema a series of questions about her performance. Heronema responded as follows:

> I will respond to your questions in the order in which you sent them:
>
> First, with regard to Tara . . . you were not listening to me when we discussed your behavior toward the other office professionals. I used the situation with Tara as an example of the type of disruptive and condescending behavior that needs to cease. This event was brought to my attention because your comment was public and offensive. I did not say who complained to me, but I did mention that it was not Tara.
>
> Second, with regard to the press kits . . . you missed the point. Jim, et al., are our clients. It is our role to support them, not ask them to "pitch in." The point is that they shouldn't have to.
>
> Third, with regard to the definition of "disciplinary action," my sincere hope is that we will not need to take disciplinary action. However, if your performance does not improve, I am prepared to follow the performance management process which includes review by an Employee Review Board. This will include me, Kathy McDonald (HR), an HR attorney, a Diversity representative, and an impartial leader (someone who does not know you or me). This is consistent with Dow process.
>
> Fourth, spending time trying to prove me wrong is not a good use of your time. Instead, you need to focus all your attention and time on changing your behavior and achieving the goals we discussed last week.

Finally, e-mail is not a good vehicle for addressing these types of questions.  I am responding via this medium because I'm in an all-day meeting.  In the future, please talk to me in person if you have questions or concerns.

Def.'s Mot. Summ J. Ex. 15, Email (Dec. 2, 2003).

The plaintiff also wrote a letter on December 6, 2003 in response to Heronema's above

email.  The plaintiff wrote:

This is a rebuttal to the attached letter dated December 2,2003 written by Jennifer Heronema, and received by me, Leslie Banks on December 2,2003.

1st paragraph
My behavior has never been condescending, disruptive or offensive towards the other office professionals.  On the contrary, we have worked very well together. We have had conflicts but we have always worked them out between ourselves. Tara was the exception to this.  I tried to solve this with Tara herself but she would not talk to me about it.  She just ranted and raved on right in my face.  Our whole group was suffering because of this one person.  This had been a problem within the group even before I got there.  It was talked about within the group but no one was willing to address it.  I showed initiative to do what needed to be done and now I have been labeled.  When asked by the person who installed my computer what the differences in the communications assistant's jobs and the OP jobs I explained to her the different roles.  If someone took that the wrong way I am sorry. I am not responsible for anyone else's thoughts or feelings.  I never indicated once that one job was more important than the other because that is not true.  They are just different I am disappointed and hurt that Jen automatically blamed me for something that I wasn't even asked about.  I was accused, judged and punished even before I knew what was going on.  The way she reacted to this you would of thought I did something horrible to someone.

2nd paragraph
You are right; I take full responsibility for the press kits.  I made a mistake.

3rd paragraph.
This still doesn't explain to me what "disciplinary action" is specifically.  I don't know what will happen to me if this is put into effect.  Will I be not be [sic] able to work without pay for awhile?  Will I be fired?  I don't know.

4th paragraph
I did not realize I did this.  I apologize.

Def.'s Mot. Summ. J. Ex. 17, Letter (Dec. 6, 2003).

-14-

On December 13, 2003, the plaintiff wrote another letter, apparently in response to the November 17, 2003 performance letter from Heronema. The plaintiff explained in her deposition that she wrote the letter a month later to help her keep "track of what was said and what I was being accused of, so that it was a note to me." Banks dep. at 108. In the letter, the plaintiff stated "[i]f people ask me about my faith as they have done in the past or if there is a discussion someone else brought up regarding my faith, I will feel free to discuss the topic just like the other people do." *Ibid.* Although the plaintiff mentioned religion in that letter, the defendant claims that the plaintiff did not raise her religion or religious references at any time thereafter.

At her deposition, the plaintiff testified that she did not complain to anyone at Dow about the discussion in the November 17 letter pertaining to religion, although she acknowledged that she did contest many of the other performance issues raised. However, the plaintiff later recalled Heronema made a point to tell her that she selected holiday cards on behalf of the business that were not religious.

On December 29, 2003 Heronema provided the plaintiff with a written update of her performance. She stated that although the plaintiff had made some improvements, she still remained concerned.

> This letter is a summary of the job performance discussion you and I had on December 11, 2003. The purpose of this discussion was to review the progress you've made since receiving a letter on November 17, 2003, indicating your performance was unacceptable.
>
> You have been making good progress toward some of the immediate actions I had outlined for you. Areas of noted improvement include:
> • You have been prepared for and have attended our weekly update meetings as discussed. Please note that our weekly update meetings will resume on Monday, January 5, and will take place each Monday thereafter.
> • You have kept your project list up to date and notified me when you were not able to complete a project on time.

• You have taken initiative in certain situations (GE Literature) and have responded with urgency when the situation called for it (meet-me-line problems).
• You have completed and turned in your time sheets as directed.  You have indicated that it was easier for you to provide specific details rather than general comments.  I said this was OK, as long as this didn't become a time consuming task.
• You have avoided risks/mistakes that would have decreased personal or group effectiveness and credibility.
• And, you have been interacting positively with your co-workers.  However, we did discuss the fact that contacting clients to determine their reaction to a past "incident" was unacceptable behavior and should not happen again.

I appreciate the progress you have made, but I remain concerned that you still are not handling the amount and type of work commensurate with your job level.

Therefore, I would like to see immediate improvement in the following areas:

Prioritization:
• Review your time sheets (daily and weekly) to see where you are spending your time and determine ways better use your time.  Please bring some ideas to our January 12 meeting.

Initiative:
• Clearly define the various literature projects you have underway and determine an appropriate deadline for each.  They are currently listed on your project list, but there is so much overlap, that it isn't clear what you're working on.  Also, I'd like to see the dates moved forward on some of these projects, as they've been outstanding for some time.  Gas Treating is most certainly the priority.
• Proactively develop value-added project ideas for further consideration.

I am committed to working with you to resolve these performance issues and to ensure you sustain performance that will allow you to continue to compete inside Dow.  We will meet again to review your progress the week of January 20th. Please look for the meeting request in your inbox.

Def.'s Mot. Summ. J. Ex. 21 (Letter Dec. 29, 2003).  Heronema stated in her affidavit that religion was not mentioned here because the topic was no longer an issue.

The plaintiff, however, testified in her deposition that Heronema told her after the letter was written that Heronema "had been watching and listening from her office to make sure that I was not talking about my religious beliefs."  Banks dep. at 49.  According to the plaintiff, Heronema also

-16-

stated that "she was very sensitive to that [i.e., religious references] and that she could hear everything from her office." *Id.* at 51. The plaintiff did not raise that issue with "anyone else at Dow." *Ibid.*

A meeting took place as scheduled on January 13, 2004. The plaintiff recalled that Heronema was "disappointed" by her effort at improvement. Banks dep. at 124. Heronema recorded her impressions of the meeting in an email to the plaintiff. She wrote:

> I wanted to take a few minutes to follow up on our weekly update meeting on Tuesday, January 13.
> I was disappointed in your progress and remain very concerned about your ability to handle the amount and type of work commensurate with your job level. At my request, you have been tracking your time since November. I asked you to do this with the expectation that you and I would review the time sheets, discuss projects weekly and develop ideas to improve your efficiency. The objective in the end is to free up your time so you can work on more value-added projects.
>
> Unfortunately, I have been the only one to offer suggestions for improvement. You must meet me halfway, if you expect the situation to improve.
>
> Here are specific examples where you have fallen short:
> • As outlined in my December 29 letter, you were supposed to suggest ways to improve your efficiency and offer project ideas that could deliver value to our business/function. Thus far, you have not done so.
> • As of Tuesday's meeting, you had not made progress against your goal to develop a maintenance plan for the Internet/Intranet. Although the plan isn't scheduled for completion until March 11, I had told you I wanted to see progress there.
> • As of Tuesday's meeting, you hadn't moved up the dates for completion of the OD literature projects, even though you and I discussed it more than once.
>
> Some of the suggestions I've offered include:
> • Contacting Eric Grates from eCommunications regarding tools and technology you can use in your website maintenance plan vs. manually clicking through the sites to see if links are broken. You need to pay close attention to the presentations that Eric gives to our group, as we will be embarking on an eStrategy for at least two of our businesses.
> • Posing questions to those individuals driving the literature projects to determine the value of the work you are doing for them. You now have one less project on your plate because the work was deemed non-value added by the project owner. This wouldn't have happened had I not questioned the necessity.

-17-

• Scheduling your projects and sticking to that time. A key competency of your role is making progress against multiple projects.

Unfortunately, I will be traveling early next week, so we cannot meet in person. However, that doesn't mean we can't make progress. Come back to me Monday, by the end of the day, with an e-mail update on your projects and some ideas for improvement. We will meet again for your 60-day Performance Review on Thursday. Please read this note carefully and think about what I'm asking you to do. If you have any questions, please see me tomorrow. I'm in all day.

Def.'s Mot. Summ. J. Ex. 22, Email (Jan. 13, 2004).

Afterward, the plaintiff requested another meeting with Heronema to discuss the plaintiff's job description. The two met on January 16, 2004, but Heronema requested time to "think on [the request to review the job description]." Heronema aff. at ¶ 106. Apparently, Heronema asked the plaintiff to meet with her after lunch, but the plaintiff did not "come to see [her] as [she] requested." *Id.* at ¶ 107.

On January 20, 2004, the plaintiff wrote a letter in response to Heronema's January 13 email. The plaintiff wrote:

This is a rebuttal to the attached letter dated January 13,2004 written by Jennifer Heronema, and received by me, Leslie Banks on January 13,2004.

First Paragraph - "I was disappointed . . ."
I am sorry I disappoint you Jennifer but it is you who have let me down in this area. You say and you are right that I have been tracking my time since November and we have reviewed my project sheet almost on a weekly basis. However, we have never reviewed one time sheet or tried to develop ideas to improve my efficiency. I was told to review my own time sheet and come back with ideas on how to improve my efficiency. This is difficult as I was never late on anything and my job was always done. I told you I didn't know how to do it differently. Your answer to this was not to spend too much time on any one project. I find this difficult to manage as time sensitive projects come up where I have to do this.

You have never sat down with me to ask me what all I do in my job. I know you don't know because of all the questions you ask. I feel you could of gotten a better idea of what I do and how time consuming it is if you would of [sic] sat down with me for an hour or two to "walk a mile in my shoes." We are supposed to be partners

-18-

helping each other rather than fighting against each other.  I was hired in as a DC4 and the job is an A2.  I have come a long way in 2 years, especially given the circumstances of my last manager.

Specific Examples where you have fallen short.
1. I needed your help and input in this area instead of you telling me I should already know.
2. I did indeed make progress against this goal.  I had made several calls to other communications assistants and asked them if they had a plan set in place for their business or knew of anyone who did.  I had also talked with Mary Martini and Leanne Jankowiak.  I just didn't have the answer you wanted yet.
3. I didn't move them up because I needed to ask you some questions regarding these projects that would have changed their completion dates.

Some of the suggestion I've offered.
2. The project that is being mentioned here is one of imputing literature into Documentum for our business.  I never questioned this as I still feel that this was part of my job.  I don't understand why you didn't.  It is not uncommon for our TS&D to come to us and ask us to put in revised literature.  It wasn't that much to do on my part.
3. I had been doing this successfully from the very beginning as my time sheets and project sheets will show.

Def.'s Mot. Summ. J. Ex. 23 (Jan. 20, 2004).

In her affidavit, Heronema described deficiencies in the plaintiff's performance over the next months.  For example, Heronema stated that the plaintiff incompetently handled the updating of the Gycol Ethers Literature Project and felt the plaintiff mishandled communications. Heronema aff. at ¶ 109.  On February 23, 2004, Heronema claimed, the plaintiff improperly organized eight "participant manuals" for an upcoming training session.  *Id.* at ¶ 114.  Frustrated, Heronema fixed the problem herself rather than discussing the deficiencies with the plaintiff.

On March 5, 2004, Heronema met with the plaintiff to explain that she would not receive a salary increase for 2004.  Heronema reduced the reasons to writing in a detailed letter dated March 8, 2004.  The letter does not mention religion or religious issues.

-19-

On March 9, 2004, the plaintiff emailed Catherine Maxey, who apparently was Heronema's supervisor, expressing concern and stating, "I am continually feeling threatened that I am going to lose my job because of my performance."  Def.'s Mot. Summ. J. Ex. 26, Email (Mar. 9, 2004). Maxey responded that "[t]his is a time when everyone in Dow would like to know the status of their job.  I recognize that the reorganization is difficult on everyone.  As I described at our last team meeting, I can't give anyone any specific reassurance because the restructuring in our function has not begun yet. . . . I would be available next week, the 18th or 19th.  If you'd like to meet then, please go ahead and set up a meeting notice."  *Ibid.*

On March 10, 2004, the plaintiff sent her last "rebuttal" letter to the human resources department expressing surprise and disappointment that she did not receive a salary increase.  She also disputed Heronema's criticism of poor performance.  Thereafter,  Heronema concluded that "[b]usiness leaders and co-workers who interact  with Leslie share the perception that she is a poor performer.  Several business leaders have expressed concern that her mistakes have had a direct, negative business impact.  In addition, her continued disruptive behavior and visibly poor performance is harming teamwork."  Heronema aff. at ¶¶ 126-27.  Consequently, Heronema requested a meeting with the Employee Review Board to discuss termination of the plaintiff.

 On March 19, 2003 the date of the meeting, the plaintiff was out of the office but apparently knew that she was the topic of discussion because she had access to Heronema's calendar.  The plaintiff called Heronema, who confirmed to the plaintiff only that a meeting was scheduled that would involve discussion of the plaintiff.  This conversation spawned another letter by the plaintiff in which she complained:

> I saw on Jennifer's calendar that there was an ERB meeting scheduled for March 19. Jennifer tells me that I am the topic but she won't share over the phone the outcome

of this meeting.  She had a chance to share this with me the day of the meeting but
for some reason didn't.  Since I have been threatened many times about losing my
job, I am assuming that is what will happen when I get back to work (I have been out
with shingles).
. . .

I will be honest and say it has not been easy working with Jennifer.  I know she feels
the same way about me.  She has told me she has a hard time separating our work
and personal relationship and that it has made our working relationship very strained.
I have seen that evidence.  That doesn't seem like the way a manager or anyone
should feel.

My co-workers have told me that they couldn't put up with the things that Jen has
put me through.  They all can see and hear it.  I don't especially like being yelled at
so loudly that all of my co-workers can hear through the shut door of an office.  This
was very embarrassing and humiliating for me.  This happened to me on more than
one occasion.  I have been told more than once that I was incompetent.
. . .

I have been bullied in the past from Jen but I have started to fight back.  I am sure
that is the reason why this has come to a head.  How embarrassing, frustrating and
humiliating this has been for me.  If my livelihood wasn't at stake here I would be
glad to have this job end.

Def.'s Mot. Summ. J. Ex. 29, Letter (Mar. 19, 2004).

After the employee review board meeting, Dow decided to terminate the plaintiff's
employment for poor performance effective March 23, 2004.  However, that date was postponed
because the plaintiff informed Heronema that she had contracted shingles and could not return to
work until the lesions subsided.  Ultimately, the plaintiff was terminated on April 12, 2004.

On April 12, 2004, the plaintiff reported to Dow's medical department to be cleared for
work.  After she was cleared, the plaintiff participated in a meeting at which she was terminated.
The meeting also was attended by Heronema, Maxey, McDonald, a Dow attorney, and a Dow
diversity representative.  McDonald dep. at 83.  Apparently, the plaintiff was not provided with a
letter or document outlining the reasons for termination, but was given severance documents.

-21-

McDonald noted in her deposition that the severance plan was not offered to "employees who are involuntarily terminated for cause" and did not explain why the plaintiff was given severance documents. *Id.* at 88.

Heronema testified at her deposition that the plaintiff was discharged because she failed to make adequate improvement on the areas identified in the November 17, 2003 letter to the plaintiff. Heronema further stated that the plaintiff had made some improvement between November 17 and December 29 but did not state whether the plaintiff's use of religious references had changed.

Heronema also believed that the plaintiff had also missed too much time from work, and absences were a part of the decision to terminate the plaintiff. She testified:

> Q.   And as part of the discharge decision, you factored in that she was missing too much time, didn't you?
> A.   She came back from medical leave in the fall of 2003 with a clean bill of health. Subsequently, there were more issues of missing work due to alleged illnesses.
> Q.   And that factored into the discharge decision?
> A.   Yes.

*Id.* at 43.

On September 28, 2004, the plaintiff filed a three-count complaint in this Court alleging a violation of Title VII because Dow discriminated against her on the basis of religion (count one); religious discrimination under Michigan's Elliot Larson Civil Rights Act (count two); and violation of the Family and Medical Leave Act because Dow failed to restore her to her previous or an equivalent position upon return from medical leave (count three). Following the discovery period, the defendant filed the present motion for summary judgment, to which the plaintiff has responded.

-22-

II.

A motion for summary judgment under Fed. R. Civ. P. 56 presumes the absence of a genuine issue of material fact for trial. The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (internal quotes omitted).

A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics and Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248). Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 534 (6th Cir. 2002). Thus a factual dispute which "is merely colorable or is not significantly probative" will not defeat a motion for summary judgment which is properly supported. *Kraft v. United States*, 991

F.2d 292, 296 (6th Cir. 1993); *see also Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 772 (6th Cir. 1999).

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp.*, 477 U.S. at 322-23.

The party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991). "[T]he party opposing the summary judgment motion must 'do more than simply show that there is some "metaphysical doubt as to the material facts."'" *Highland Capital, Inc. v. Franklin Nat. Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 800 (6th Cir. 1994), and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "Thus, the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there

must be evidence on which the jury could reasonably find for the plaintiff." *Ibid.* (quoting *Anderson*, 477 U.S. at 252) (internal quote marks omitted).

### A.

The Court first turns to the plaintiff's claims of religious discrimination. Although the plaintiff has brought that claim under both the Michigan and federal statutes, only one analysis need be preformed because Michigan's Elliot Larson Civil Rights Act tracks federal law, and the Michigan courts often refer to Title VII jurisprudence when evaluating such claims. *See Cline v. Auto Shop, Inc*, 241 Mich. App 155, 157-58, 614 N.W.2d 687, 688 (2000).

Title VII of the 1964 Civil Rights Act makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against an individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion . . . ." 42 U.S.C. § 2000e-2(a). Michigan law is the same. *See* Mich. Comp. Laws § 37.2101 *et seq.* A person alleging a violation of Title VII has the initial burden of establishing that her employer discriminated against her because of religion. *Cooper v. Federal Reserve Bank of Richmond*, 467 U.S. 867 (1984).

The Sixth Circuit has held that it uses "a two-step analysis in evaluating claims of religious discrimination." *E.E.O.C. v. Arlington Transit Mix, Inc.*, 957 F.2d 219, 221 (6th Cir. 1991). First, the plaintiff must establish a *prima facie* case. Second, if the plaintiff is successful, "the employer [must] show that it could not reasonably accommodate the employee without undue hardship in the conduct of its business." *Ibid.*

A *prima facie* case consists of proof that the employee "holds a sincere religious belief that conflicts with an employment requirement, [s]he has informed h[er] employer of the conflict, and

[s]he was discharged for failing to comply with the conflicting employment requirement." *Id.* at 221. "The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

The defendant argues that the plaintiff has not established a *prima facie* case because there is no proof that the termination was due to any of the plaintiff's religious practices of beliefs. The parties agree that an employer's illegal motive can be established under Title VII either by direct or circumstantial evidence. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004) (stating that "[i]n Title VII actions, 'a plaintiff may establish discrimination either by introducing direct evidence of discrimination or by proving inferential and circumstantial evidence which would support an inference of discrimination'" (quoting *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir.1997)). In this case, the plaintiff relies solely on the claim that direct evidence of discrimination exists in the record.

"Direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Weberg v. Franks*, 229 F.3d 514, 522 (6th Cir. 2000) (internal quotes omitted); *Jacklyn v. Schering Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). It does not require the fact finder to draw any inferences to reach that conclusion. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). "This credible and direct evidence cannot be based on rumors, conclusory allegations, or subjective beliefs." *Hein v. All America Plywood Co., Inc.*, 232 F.3d 482, 488 (6th Cir. 2000); *see Mitchell v. Toledo Hosp.*, 964 F.2d 577, 585 (6th Cir. 1992) (rejecting the plaintiff's affidavit as

evidence of age discrimination where it was comprised of the plaintiff's subjective beliefs). "Nor can it be based on vague, ambiguous, or isolated remarks." *Hein*, 232 F.3d at 488; *see Phelps v. Yale Sec., Inc.*, 986 F.2d 1020 (6th Cir. 1993) (finding no *prima facie* case of age discrimination, even though the plaintiff's supervisor twice stated that the plaintiff was too old to continue at her prior secretarial position, because these were only isolated and ambiguous comments).

The plaintiff argues that there are two items of direct evidence of religious discrimination: she cites to her own deposition testimony in which she claims MacDonald told her she had to "tone it down" with respect to religious references; and she points to the November 17, 2003 letter in which Heronema told her that her display of religious affinity could create "a hostile work environment" for other employees, and she needed "to use good judgment in both written and verbal communications." Def.'s Mot. Summ. J. Ex. 9, Letter (Nov. 17, 2003). However, neither of these incidents led to disciplinary action against the plaintiff. There is no evidence in the record that the plaintiff continued to proselytize, foist her own beliefs on her co-workers, or contributed to a hostile work environment. Rather, it appears from the undisputed evidence that she "tone[d] it down" and "use[d] good judgment" in her workplace display of her religious beliefs. Nor is there any evidence that the plaintiff expressed to her employer the need to witness her religious beliefs in the workplace, or engage in any other practice that would have presented the employer with the need to accommodate her. Nowhere in the rather voluminous record of performance reviews, rebuttals and rejoinders painstakingly presented by the parties and recounted in detail above is there any suggestion that the plaintiff's termination was directly attributed to the comments by Banks' supervisor four months earlier, which referenced Banks' religious judgments and commentary to her

co-workers.  There is no direct evidence in this record that Dow fired Banks because of her religious beliefs or practices.

Although the plaintiff has not urged the point, illegal discrimination can be established inferentially.  *See Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999).  That method, described in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981), requires a plaintiff to present a *prima facie* case, at which point the defendant must come forward with a legitimate, non-discriminatory reason for its action. If the defendant is able to offer such a reason for the adverse employment action, the plaintiff must offer evidence that the defendant's justification is a pretext that masks its true discriminatory intent. *See Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003).

In order to establish a *prima facie* case, the plaintiff must show that (1) she is a member of a protected group; (2) she was subject to an adverse employment action; (3) she was qualified for the position; and (4) she was replaced by someone outside the protected class or was treated less favorably than a similarly-situated employee outside the protected class.  *Hall v. Baptist Memorial Health Care Corp.*,  215 F.3d 618, 625-26 (6th Cir. 2000).  *But see White v. Columbus Metro. Housing Auth.*, 429 F.3d 232, 242 (6th Cir. 2005) (requiring as part of the *prima facie* case that "the plaintiff . . . establish that she and the non-protected person who ultimately was hired for the desired position had similar qualifications," despite prior Sixth Circuit precedent that "warns against conflating the first (prima facie case) and second (articulation of a legitimate non-discriminatory reason) steps in the McDonnell-Douglas analysis").

There is no dispute that the plaintiff's expressed religious beliefs bring her within Title VII's protection.  Similarly, she was not given a salary increase and was terminated, which are adverse

-28-

employment actions.  Indulging the facts may allow a conclusion for purposes of argument that the plaintiff was qualified, since she received an employment award early in her tenure with Dow. However, there is no evidence that any other similarly-situated co-workers not of her faith that were treated more favorable.

"To satisfy the fourth prong in such cases, the plaintiff must show that the defendant treated differently employees who were similarly situated but were not members of the protected class." *Sutherland v. Mich. Dept. of Treas.*, 344 F.3d 603, 614 (6th Cir. 2003); *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 801 (6th Cir. 1994).  The plaintiff has failed to identify *any* other employees who were treated differently, perhaps because she chose to argue only her direct evidence case.

But even if a *prima facie* case were established, the record overwhelmingly establishes that the plaintiff's termination was based on her poor performance.  Dow was faced with an employee who chronically made mistakes in her job that reflected detrimentally on the company, she was counseled by her supervisor, she questioned the efforts to assist her in her own improvement, and she failed to measure up to her employer's reasonable expectations.  Dow has presented a legitimate reason for the termination.  The plaintiff has not attempted to show that it was a pretext for religious discrimination.

B.

The defendant also argues that it did not violate the Family and Medical Leave Act because it did not know that the plaintiff was taking her second leave of absence until after the termination decision was made, and the plaintiff would have been terminated on March 23, 2004 regardless of her leave taking.

-29-

The Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.,* provides covered employees up to twelve workweeks of leave upon, among other things, the occurrence of "a serious health condition" rendering the employee unable "to perform the functions of the [her] position." 29 U.S.C. § 2612(a)(1)(A), (D). To invoke FMLA leave, an employee need only give her employer notice of her request for leave and state "a qualifying reason for the needed leave;" she need not expressly designated the leave as FMLA leave. 29 C.F.R. § 825.208(a)(2). Upon return to work before the expiration of the twelve workweek period, an employee must either be restored to her position or, if unavailable, an equivalent position. 29 U.S.C. § 2614(a)(1). Further, an employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" guaranteed by the FMLA, and may not discharge or discriminate in any way against an employee for opposing practices that are unlawful under the FMLA. 29 U.S.C. § 2615.

The plaintiff alleges both interference and retaliation claims. FMLA retaliation claims, like their counterpart in Title VII discrimination cases, employ the familiar *McDonnell Douglas* burden shifting analysis. *Skrjanc v. Great Lakes Power Service Co.*, 272 F.3d 309, 315 (6th Cir. 2001). A *prima facie* case of FMLA retaliation is established by providing evidence of the following three elements: (1) the plaintiff availed herself of a protected right under the FMLA, including notifying her employer of her intent to take leave; (2) she was adversely affected by an employment action; and (3) there was a causal connection between the exercise of the protected right and the adverse employment action. *Id.* at 314. To succeed on an FMLA interference claim, a plaintiff must demonstrate that (1) she was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of her intention to take leave; and (5) the employer denied the employee FMLA

benefits to which she was entitled. *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003).

The Court finds that the plaintiff cannot prevail on either theory, however, because of the operation of one, overriding principle: "An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period." 29 C.F.R. § 825.216. *See also Throneberry v. McGehee Desha County Hosp.*, 403 F.3d 972, 978 (reasoning "that the FMLA's plain language and structure dictates that, if an employer were authorized to discharge an employee if the employee were not on FMLA leave, the FMLA does not shield and employee on FMLA leave from the same, lawful discharge"); *Hoge v. Honda of America Mfg., Inc*. 384 F.3d 238, 244 (6th Cir. 2004) (holding that "[a]n employee returning from FMLA leave is not entitled to restoration unless he would have continued to be employed if he had not taken FMLA leave. For instance, an employer need not restore an employee who would have lost his job or been laid off even if he had not taken FMLA leave").

The undisputed facts demonstrate that in this case, the plaintiff would have been terminated irrespective of her taking leave in March 2004. Heronema testified that the plaintiff was discharged because of poor performance. Although the plaintiff was to be terminated effective March 23, 2004, that decision was put off until the plaintiff returned from leave on April 12, 2004. When asked about the role of absences played in the decision to terminate the plaintiff, Heronema answered the plaintiff "came back from medical leave in the fall of 2003 with a clean bill of health. Subsequently, there were more issues of missing work due to alleged illnesses." Heronema dep. at 43. However, at the time of the decision to terminate the plaintiff on March 19, 2004, there is no evidence that Heronema knew that the plaintiff had taken FMLA leave for a second time. The plaintiff did write

-31-

a letter on March 19, 2004 indicating she was out with shingles, *see* Def.'s Mot. Summ. J. Ex. 29, Letter (Mar. 19, 2004), but there is no evidence to suggest that letter was received or read by any of the persons who attended the meeting at which the decision to terminate the plaintiff was made.

On the other hand, as noted earlier, there is abundant evidence of the plaintiff's performance difficulties and the defendant's multiple remedial efforts. The plaintiff developed an antagonistic attitude toward her supervisor and, in her words, decided to "fight back." The defendant had legitimate reasons to terminate her; there is no evidence that the leave of absence played a role. The FMLA is not a guarantee against discharge while on leave; it simply places an employee on equal footing with others who did not take FMLA leave. There is no evidence that the plaintiff was treated differently because of the leave.

With respect to the retaliation claim, the record does demonstrate that absences because of illnesses were a factor in terminating the employment. However, the defendant provides evidence, which the plaintiff has not disputed, that none of the illnesses referenced had *anything* to do with FMLA leave. *See* Heronema aff. at ¶¶ 19, 20 (noting that the plaintiff had been absent several times for doctors appointments that affected Heronema's ability to complete her own job). There is no indication that leave was requested for these absences or that they were FMLA qualifying. As noted, the inquiry in a retaliation case is not confined to demonstrating a *prima facie* case. The plaintiff also must provide evidence that the defendant's reason for termination – poor performance including taking a number of non-FMLA absences – was a pretext for retaliation for resorting to activity protected by the FMLA. The plaintiff has offered no evidence to establish pretext here – she simply claims a *prima facie* case is present – and a reasonable trier of fact could not conclude that the plaintiff was retaliated against for taking FMLA leave.

-32-

III.

The Court concludes that the plaintiff has not come forward with evidence that creates a genuine fact issue on any of her claims. The defendant, therefore, is entitled to summary judgment as a matter of law.

Accordingly, it is **ORDERED** that the defendant's motion for summary judgment [dkt # 20] is **GRANTED**.

It is further **ORDERED** that the complaint is **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that the plaintiff's motion *in limine* to exclude the defendant from calling any witnesses at trial [dkt # 28] is **DENIED** as moot.

It is further **ORDERED** that the defendant's motion for leave to file a lay witness list [dkt # 31] is **DENIED** as moot.

It is further **ORDERED** that the defendant's renewed motion to file a witness list [dkt # 34] is **DENIED** as moot.

It is further **ORDERED** that the defendant's motions *in limine* to exclude evidence of a severance plan and employee networks [dkt #s 35, 36] are **DENIED** as moot.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: January 19, 2006

<div style="border:1px solid;">

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on January 19, 2006.

s/Tracy A. Jacobs
TRACY A. JACOBS

</div>